**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------ X

**RIVKA MARTHA MORIAH, et al.,**

         **Plaintiffs,**

      - against -

**BANK OF CHINA LIMITED,**

         **Defendant.**

------------------------------------------------------ X

**OPINION AND ORDER**

**12 Civ. 1594 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.     INTRODUCTION

On October 14, 2014, the Court, on plaintiffs' motion, issued an order to show cause why a subpoena should not issue[1] for Joseph Ciechanover to give deposition testimony regarding a phone call he placed to plaintiffs' counsel in the related *Wultz v. Bank of China* case regarding the possibility of settlement.   In his response, Ciechanover argued that the subpoena should not issue for two reasons: (1) it would not serve the interests of justice; and (2) Ciechanover has testimonial

---

[1]     Because Ciechanover is a permanent resident of the United States who resides in Israel, plaintiffs may procure his deposition testimony pursuant to a subpoena issued under 28 U.S.C. § 1783.

immunity as an agent for the State of Israel.[2]  I held a hearing on the matter on November 25, 2014, during which I ordered that plaintiffs could propound interrogatories to Ciechanover concerning the capacity in which Ciechanover approached plaintiffs' counsel to determine whether he acted as an agent for the State of Israel.  Plaintiffs served a list of forty-four questions, some with multiple subparts, to Ciechanover.[3]  On December 15, 2014, Ciechanover agreed to voluntarily respond to five of those questions that he deemed "consistent with the parameters established by the Court."[4]  Plaintiffs now move either to compel Ciechanover to answer the remaining questions or to draw every inference favorable to the plaintiffs with respect to the unanswered questions and direct Ciechanover to appear for a deposition.[5]  For the reasons set forth below, plaintiffs' motion is DENIED because Ciechanover is immune from compelled testimony.

---

[2]     *See* Dr. Joseph Ciechanover's Response to the Court's Order to Show Cause Why a Subpoena Should Not Issue Under 28 U.S.C. § 1783 ("Opp. Mem."), at 1.

[3]     *See* Plaintiffs' Interrogatories/Questions to Joseph "Yossi" Ciechanover ("Interrogatories"), Exhibit B to 2/4/15 Letter to the Court from Robert J. Tolchin, Counsel to Plaintiffs ("Tolchin Letter").

[4]     1/20/15 Letter to the Court from Stewart D. Aaron, Counsel to Ciechanover, at 2.

[5]     *See* Tolchin Letter, at 2.

## II.   BACKGROUND[6]

Plaintiffs seek to depose Ciechanover in connection with a future application for a spoliation sanction.  Plaintiffs had sought testimony from Uzi Shaya, a former Israeli national security officer.  The State of Israel, after initially supporting Plaintiffs' attempts to secure Shaya's testimony, later withdrew that support.

Plaintiffs allege that Israel withdrew its support for Shaya's testimony because of pressure exerted on Israel by the People's Republic of China, and claim that Ciechanover has information regarding this alleged pressure.  Specifically, plaintiffs allege that Ciechanover contacted the *Wultz* plaintiffs' counsel, Lee Wolosky, "on behalf of Israeli Prime Minister Netanyahu, in an attempt to broker a settlement of the law suit against BOC."[7]  Plaintiffs allege that "[d]uring that conversation, Ciechanover indicated that Israel's diplomatic relationship with China was the reason that Israel had rescinded its authorization for Shaya to testify

---

[6]     This case has proceeded in tandem with the *Wultz v. Bank of China* case.  The general facts and procedural history of these cases and Plaintiffs' numerous attempts to obtain discovery from Bank of China were laid out in previous opinions and familiarity with them is assumed.  *See Wultz v. Bank of China Ltd.*, No. 11 Civ. 1266, 2014 WL 3610898 (S.D.N.Y. July 21, 2014); *Wultz v. Bank of China Ltd.*, 942 F. Supp. 2d 452 (S.D.N.Y. 2013); *Wultz v. Bank of China Ltd.*, 910 F. Supp. 2d 548 (S.D.N.Y. 2012).

[7]     Memorandum of Law in Support of Plaintiffs' Motion for a Subpoena Pursuant to 28 U.S.C. § 1783, at 6.

3

and that he had been asked by Netanyahu to try to negotiate a settlement of the case to avoid further embarrassment for Israel."[8]

Ciechanover responded to the order to show cause and attached a declaration explaining the facts surrounding the phone call at issue.  According to his declaration, Ciechanover states that in his capacity as a senior advisor to the Government of Israel, he was contacted by the Prime Minister's Office in late 2013 and asked to contact the parties' counsel in *Wultz* and inquire whether the parties might be amenable to an out-of-court resolution of the lawsuit.[9]  He further states that he was not provided with any further information regarding the case.[10]  He contacted the *Wultz* plaintiffs' counsel, Lee Wolosky, by phone in October 2013, and was informed that "the lawyers for the parties were not 'on speaking terms' and that [Wolosky] did not believe that the Bank of China's U.S. counsel had authority to agree to an out-of-court resolution."[11]  The phone call lasted "less than five minutes."[12]  He then reported the content of the call to the Prime Minister's

---

[8]     *Id.*

[9]     11/7/14 Declaration of Dr. Joseph Ciechanover ("Ciechanover Decl."), Exhibit to Opp. Mem., ¶ 4.

[10]     *Id.*

[11]     *Id.* ¶ 5.

[12]     *Id.*

Office and had no further involvement in the matter.[13]

During the conference addressing this matter, Mr. Wolosky made a statement under oath regarding the content of this phone call. He stated that Ciechanover "identified himself as a former Israeli government official" and explained that he was "occasionally called upon to solve problems for Israel."[14] Mr. Wolosky stated that the conversation lasted about twenty to thirty minutes.[15] When questioned by the Court, Mr. Wolosky relayed that Ciechanover did not represent himself as an agent of the government of Israel.[16] Rather, Mr. Wolosky "viewed him as a mechanism that had been created to enable" a discussion regarding a resolution of the case, but not as an individual "acting on behalf of Israel."[17]

In response to plaintiffs' interrogatories, Ciechanover explained that he has been a "senior advisor to various high-ranking Israeli government officials,"

---

[13]   *Id.* ¶ 6.

[14]   Transcript of 11/25/14 Conference ("Tr.") at 31.

[15]   *Id.* at 32. Though this contradicts Ciechanover's declaration, the discrepancy is irrelevant as it does not relate to the capacity in which Ciechanover made the phone call.

[16]   *Id.*

[17]   *Id.* at 33–34.

including four Israeli prime ministers, after his retirement from civil service.[18]  In this capacity, he "provide[s] insight on a given issue or assist[s] on particular assignments . . . ranging from nearly full-time projects over the course of several months to . . . a single phone call."[19]  In this case, he was asked by the then-Israeli National Security Advisor and head of the National Security Counsel, Major General (Res.) Yaacov Amidror, to contact the *Wultz* plaintiffs' counsel and inquire whether the parties would consider resolving their claims out of court.[20]  After contacting Mr. Wolosky, Ciechanover again spoke to General Amidror to inform him about the call.  Ciechanover states that he was "acting as an agent of the State of Israel in the sense that [his] call to Mr. Wolosky was made at the request of and at the direction of General Amidror on behalf of the Prime Minister's Office."[21]  The current Israeli National Security Advisor, Joseph M. Cohen, supports this account and confirms that the call was made "at the request and instructions of [his] predecessor . . . ."[22]

---

[18]     Dr. Joseph Ciechanover's Objections and Responses to Plaintiffs' Interrogatories Regarding Immunity ("Ciechanover Responses"), at 4. (Dkt. 127).

[19]     *Id.*

[20]     *See id.* at 4–5.

[21]     *Id.* at 6–7.

[22]     1/14/15 Letter from Joseph M. Cohen, Israeli National Security Advisor, to the Court, Exhibit to 1/20/15 Letter from Stewart D. Aaron.

## III.   COMMON LAW FOREIGN SOVEREIGN IMMUNITY[23]

Foreign official immunity provides broad protection from a domestic court's jurisdiction.[24]  In *Samantar v. Yousuf*, the United States Supreme Court clarified that the Foreign Sovereign Immunities Act ("FSIA") governs determinations of sovereign immunity for foreign states, but not for current or former foreign officials.[25]  Therefore, "[e]ven if a suit [against a foreign official] is not governed by the Act, it may still be barred by foreign sovereign immunity under the common law."[26]

Courts apply a "two-step procedure" to assess common-law claims of foreign sovereign immunity.[27]  "Under that procedure, the diplomatic representative of the sovereign could request a 'suggestion of immunity' from the

---

[23]   Ciechanover also argues that his testimony is not "necessary in the interest of justice" as required by 28 U.S.C. § 1783.  Because I find that Ciechanover has testimonial immunity, I need not determine whether his testimony is necessary.

[24]   *See The Schooner Exch. v. McFaddon*, 11 U.S. 116, 137 (1812) ("One sovereign being in no respect amenable to another; and being bound by obligations of the highest character not to degrade the dignity of his nation, by placing himself or its sovereign rights within the jurisdiction of another . . . ."); *Belhas v. Ya'alon*, 515 F.3d 1279, 1293 (D.C. Cir. 2008).

[25]   *See* 560 U.S. 305, 320 (2010).

[26]   *Id.* at 324.

[27]   *Id.* at 312.

State Department."[28]  If the State Department grants the request, "the district court

surrender[s] its jurisdiction."[29]  But if the State Department declines the request or

provides no response, "a district court ha[s] authority to decide for itself whether

all the requisites for such immunity exist[]."[30]  When deciding for itself, "a district

court inquire[s] whether the ground of immunity is one which it is the established

policy of the State Department to recognize."[31]

       "[C]ustomary international law has long distinguished between status-

based immunity afforded to sitting heads-of-state and conduct-based immunity

available to other foreign officials . . . .  This type of immunity stands on the

foreign official's actions, not his or her status, and therefore applies whether the

individual is currently a government official or not."[32]  This immunity also extends

beyond current and former government officials to individuals acting as an agent

for the government.[33]  It is "well-settled law that contractors and common law

---

[28]     *Id.* at 311 (quoting *Ex parte Peru*, 318 U.S. 578, 581 (1943)).

[29]     *Id.*

[30]     *Id.* (citing *Ex parte Peru*, 318 U.S. at 587).

[31]     *Id.* at 312 (citing *Republic of Mexico v. Hoffman*, 324 U.S. 30, 36 (1945)).

[32]     *See Yousuf v. Samantar*, 699 F.3d 763, 774 (4th Cir. 2012).

[33]     *See Heaney v. Gov't of Spain*, 445 F.2d 501, 504 (2d Cir. 1971) (quoting Restatement of Foreign Relations Law of the United States § 66(f)

8

agents acting within the scope of their employment . . . have derivative sovereign immunity."[34]  Conduct-based immunity depends on "the act itself and whether the act was performed on behalf of the foreign state and [is] thus attributable to the state."[35]  Therefore, to determine the scope of a foreign official's immunity, the relevant inquiry focuses on the official's acts, and not the official's status.[36]  Courts have consistently distinguished between official and private acts to determine immunity: "a foreign official may assert immunity for official acts performed within the scope of his duty, but not for private acts where the officer purports to act as an individual and not as an official . . ."[37]

Case law involving immunity of non-party foreign officials is scarce. But a D.C. District Court recently held — and the D.C. Circuit unanimously

---

(1965)) ("[T]he immunity of a foreign state extends to any other 'official *or agent* of the state with respect to acts performed in his official capacity if the effect of exercising jurisdiction would be to enforce a rule of law against the state.'") (emphasis added).

[34]     *Butters v. Vance Int'l, Inc.*, 225 F.3d 462, 466 (4th Cir. 2000) (citing *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 21–22 (1940)).

[35]     *Rishikof v. Mortada*, No. 11 Civ. 2284, 2014 WL 4802455, at *3 (D.D.C. Sept. 29, 2014) (citing *Yousef*, 699 F.3d at 774 and *Matar v. Dichter*, 563 F.3d 9, 14 (2d Cir. 2009)).

[36]     *See Matar*, 563 F.3d at 14 ("An immunity based on acts—rather than status—does not depend on tenure in office.").

[37]     *Yousuf*, 699 F.3d at 775 (internal quotations omitted).

affirmed — that non-party, Alvaro Uribe, a former president of Colombia, could not be deposed even though he was served with a subpoena while visiting the District of Columbia.[38]  In that case, the State Department granted a Suggestion of Immunity that "former President Uribe enjoys residual immunity from this Court's jurisdiction insofar as Plaintiffs seek information (i) relating to acts taken in his official capacity as a government official; or (ii) obtained in his official capacity as a government official."[39]  The court agreed that Uribe could not be compelled to testify about "information he received and acts he took in his official capacity as a government official."[40]  Thus, immunity protects non-parties from compelled testimony because "sovereign immunity is an immunity from trial and the attendant burdens of litigation, and not just a defense to liability on the merits."[41]

## IV.   DISCUSSION

There is no indication that Ciechanover or the State of Israel requested

---

[38]     *See Giraldo v. Drummond Co., Inc.*, 808 F. Supp. 2d 247, 249 (D.D.C. 2011), *aff'd*, 493 Fed. App'x 106 (D.C. Cir. 2012), *cert. denied*, 133 S. Ct. 1637 (2013).

[39]     *Id.* (citing Statement of Interest and Suggestion of Immunity of the United States, *Giraldo v. Drummond Co.*, 808 F. Supp. 2d 247 (D.D.C. 2011) (No. 10-mc-764) ("*Giraldo* SOI"), at 1–2).

[40]     *Id.*

[41]     *Id.* at 250–51 (citing *Foremost–McKesson, Inc. v. Islamic Repub. of Iran*, 905 F.2d 438, 443 (D.C. Cir. 1990)).

a Suggestion of Immunity from the State Department.  Therefore, I must determine "whether the ground of immunity is one which it is the established policy of the State Department to recognize."[42]

Ciechanover made the phone call in question on behalf of the Israeli government, and therefore has immunity with respect to this act.  As required under common law foreign immunity, Ciechanover acted as an agent of a foreign government and performed the act as part of his official duty.  Further, exercising jurisdiction would have the effect of enforcing a rule of law against the state.

The facts elicited in Ciechanover's declaration, answers to interrogatories, and Mr. Wolosky's statement establish that Ciechanover acted as an agent of the Israeli government for this specific task.  He was contacted by the National Security Advisor, a high-ranking official in the Prime Minister's office, and asked to undertake a task.  He performed that task and then reported back.  He did not undertake this task in his capacity as a private individual—he performed it solely because the National Security Advisor made a request.  As such, he acted as an agent of the Israeli government.

Plaintiffs contend that Ciechanover was not acting at the behest of the Israeli government.  Instead, plaintiffs allege that the Prime Minister specifically

---

[42]     *Samantar*, 560 U.S. at 312 (citing *Hoffman*, 324 U.S. at 36).

asked a non-governmental official to carry out this task in order maintain distance

from it.  Plaintiffs argue that Ciechanover made this call to "solve Mr. Netanyahu's

political problem."[43]  In this respect, he acted as an individual to assist the Prime

Minister in solving a personal political problem—not a governmental problem.

Therefore, he was not acting as an agent and is not entitled to immunity.

   However, this version of events is pure conjecture.  No facts exist to

support the contention that Ciechanover performed this task as a personal favor to

the Prime Minister.  Indeed, the request came from General Amidror, the National

Security Advisor, and there is nothing to suggest that the Prime Minister had any

contact with Ciechanover in relation to this assignment.[44]  Even assuming that

some of plaintiffs' speculation is true does not change the result.  Plaintiffs argue

that the Israeli government wanted to avoid a public connection with this attempt at

resolution, and for that reason used a private citizen instead of a government

lawyer.[45]  There is some support for this, as Mr. Wolosky indicated that

Ciechanover "took pains actually not to say" that he was asked to call by the Prime

---

[43]  Tr. at 27.

[44]  *See* Ciechanover Responses at 5 (Question: "Did this contact include contact with the Prime Minister?" Answer: "No.").

[45]  *See* Tr. at 15 ("You're a private citizen, it's not us, go and see if you can make this go away.").

Minister.[46]  But this further supports the conclusion that Ciechanover acted as an

agent of the government.  Even if the Israeli government wanted to avoid being

seen as a part of this attempt, it does not change the fact that it was the government

who instigated the call, and the government who was interested in the outcome.  In

other words, Ciechanover acted at the behest of the government even if he actively

avoided making that representation when performing his task.

    Plaintiffs further argue that Ciechanover's refusal to fully answer the

interrogatories leaves questions about his role, and that the Court should draw

inferences in favor of plaintiffs.  However, the questions that Ciechanover did not

answer were either duplicative, outside the parameters set at the conference, or

irrelevant.  For example, plaintiffs complain that Ciechanover did not answer the

question "What specific duties, if any, are required of you as a result of your status

as 'senior advisor'?"[47]  However, Ciechanover did answer the previous question,

asking him to "[e]xplain the nature of your status as a 'senior advisor,'"[48] and in

that response explained the "assignments vary in scope—ranging from nearly full-

time projects over the course of several months to, as in this case, a single phone

---

[46]  *Id.* at 32.

[47]  Interrogatories at 2.

[48]  *Id.* at 1.

call."[49]  As these interrogatories were answered voluntarily for the sole purpose of

determining Ciechanover's role, he did not need to answer two questions when one

sufficed to give the relevant information.  Further, his refusal to answer questions

regarding, for example, whether he was briefed about the *Wultz* and *Moriah* cases

before the phone call, whether he discussed these cases with various other

members of the Israeli government, and whether he met with Eric Cantor was

appropriate as these questions were outside the scope of the interrogatories

permitted by the Court.[50]

       Plaintiffs also contend that Ciechanover's failure to answer questions

regarding whether he is a registered foreign agent under the Foreign Agent

Registration Act or the Lobbying Disclosure Act of 1995 has particular

significance.  Plaintiffs contend that if he is an agent, then he must be registered,

and "[h]aving failed to register . . ., Dr. Ciechanover should not be heard to argue

that he was a foreign agent entitled to special protections . . . ."[51]  This argument,

---

[49]     Ciechanover Responses at 4.

[50]     *See* Interrogatories at 3–4; Tr. at 39 ("I would not let any questions be asked as to what was said to you, what do you know about this case, was the name *Wultz* mentioned, was the name *Moriah* mentioned. . . . It's just to establish his role, on whose behalf did he make this call, and what does it mean to be a senior advisor.").

[51]     2/9/15 Letter from Robert J. Tolchin to the Court, at 1.

however, conflates status-based immunity with conduct-based immunity.[52]  It matters little whether Ciechanover had the title of "agent."  Rather, what matters is whether, for this particular task, he *acted* as an agent of the government.  As discussed above, his conduct establishes that the act was undertaken on behalf of the State of Israel.

Finally, if this Court exercises jurisdiction and issues a subpoena, compelling Ciechanover's testimony would "have the effect of enforcing a rule of law against the state."[53]  Plaintiffs wish to depose Ciechanover solely to gain information regarding the Israeli government's actions and decisions — namely, whether China exerted pressure on Israel to withdraw support for Shaya's testimony.  The "rationale for sovereign immunity is the avoidance of possible embarrassment to those responsible for the conduct of the nation's foreign relations . . . ."[54]  The State Department has a "restrictive" theory of immunity that tries to "'accommodate the interest of individuals doing business with foreign governments in having their legal rights determined by the courts, with the interest of foreign governments in being free to perform certain political acts without

---

[52]     *See Matar*, 563 F.3d at 14.

[53]     *Heaney*, 445 F.2d at 504.

[54]     *Id.* at 503.

15

undergoing the embarrassment or hindrance of defending the propriety of such acts before foreign courts.'"[55]  These political acts include "acts concerning diplomatic activity."[56]  The information that plaintiffs hope to obtain from Ciechanover's testimony relates solely to "political acts" that implicate Israel's diplomatic relations with other nations.  The effect of this Court issuing a subpoena to elicit this testimony — and then using the testimony in order for this Court to pass judgment on the propriety of Israel's actions — would enforce a rule of law against Israel.  Therefore, Ciechanover is immune from compelled testimony with respect to his actions relating to this case.

## V.    CONCLUSION

For the foregoing reasons, plaintiffs' request for a subpoena is DENIED.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
           February 13, 2015

---

[55]      *Id.* (quoting *Victory Transport, Inc. v. Comisaria General*, 336 F.2d 354 (2d Cir. 1964)).

[56]      *Id.*

**- Appearances -**

**For Plaintiffs**:

Robert Joseph Tolchin, Esq.
Aalok J. Karambelkar, Esq.
The Berkman Law Office, LLC
111 Livingston Street, Suite 1928
Brooklyn, NY 11201
(718) 885-3627

**For Defendant**:

Mitchell R. Berger, Esq.
Patton Boggs LLP (DC)
2550 M Street, N.W.
Washington, D.C. 20037
(202) 457-5601

Lanier Saperstein, Esq.
William G. Primps, Esq.
Neil McDonell, Esq.
Eric Epstein, Esq.
Daniel Goldberger, Esq.
H. Alex Iliff, Esq.
Geoffrey Sant, Esq.
Dorsey & Whitney LLP
51 West 52nd Street
New York, NY 10019
(212) 415-9309

**For Joseph Ciechanover**:

Steward D. Aaron, Esq.
Arnold & Porter, LLP
399 Park Avenue
New York, NY 10022
(212) 715-1000

John Bellinger III, Esq.
Robert A. DeRise, Esq.
Robert N. Weiner, Esq.
Arnold & Porter, LLP (DC)
555 Twelfth Street, N.W.
Washington, D.C 20004
(202) 942-5999

17